## C. COLLIER SMITH v. VILLAGE OF HIBBING.

136 N. W. (2d) 609.

July 16, 1965—No. 39,819.

*Gannon & Kne,* for appellant.

*I. R. Galob,* for respondent.

SHERAN, JUSTICE.

Appeal from an order of the district court denying a motion for a new trial.

On April 7, 1964, at about 1 p. m., plaintiff sustained personal injuries when he fell on East Howard Street, the principal east-west street in the business district of Hibbing. The sidewalk at the place of the accident is about 12 feet wide and is bounded on the north by the curb line and on the south by a parking lot, just west of which the Androy Hotel is located. Plaintiff claimed that he slipped and fell at a point on the sidewalk between the east building line of the hotel and a driveway about 40 feet east of it.

Notice of injury was given on May 4, 1964, and the present action by plaintiff was instituted on June 16 of that year. The village, by its answer, denied negligence, pleaded contributory negligence, and claimed absence of "sufficient notice as required by law." No other affirmative defense was alleged or asserted at trial. At the close of the evidence a verdict was directed for defendant upon the ground that plaintiff had failed to establish by credible evidence that the village of Hibbing had sufficient actual or constructive notice of the icy condition said to have caused the accident.

The issue on appeal, then, is whether there was enough evidence of negligence to take the case to the jury.

■ Although the testimony of the plaintiff as to the place and circumstances of his fall was not precise or altogether consistent, we believe that viewed in the light most favorable to him, and supplemented by pictures of the sidewalk in the area where he fell taken about three hours afterwards, it was sufficient to support a jury finding that he was caused to fall by reason of the presence of ice on the sidewalk which was both rough and slippery. In the past we have held that such a condition may give rise to a claim for damages against a municipal corporation. Hall v.

City of Anoka, 256 Minn. 134, 97 N. W. (2d) 380; Donald v. Moses, 254 Minn. 186, 94 N. W. (2d) 255.

■ But it is not sufficient for recovery that the plaintiff in a case such as this show that he was caused to fall by rough ice. Bury v. City of Minneapolis, 258 Minn. 49, 102 N. W. (2d) 706. It must also be inferable from the evidence that the municipal corporation had either actual or constructive notice of the perilous condition a sufficient time before the accident to allow reasonable opportunity to remedy it. Mesberg v. City of Duluth, 191 Minn. 393, 254 N. W. 597. And since a municipality is not required to guard against mere slipperiness caused by a natural flow of water from melted ice and snow, Henkes v. City of Minneapolis, 42 Minn. 530, 44 N. W. 1026, it follows that the actual or constructive notice must be of hazards due to slippery ice made more dangerous by reason of a rough or uneven surface.

■ The testimony upon which plaintiff relies in support of his contention that the city knew or should have known of the condition described by plaintiff—and confirmed by the pictures received in evidence—was that of Charles Birkeland, a Hibbing accountant, 33 years of age, who had served as the president of the Junior Chamber of Commerce in that city. He testified that within a month before April 7, 1964, he had had occasion to observe the sidewalk on the south side of Howard Street between the Androy Hotel and a filling station located just to the east of the parking lot "a couple of times each week." He noted the condition of the walk between the hotel and the station shortly after the accident and described the pictures received in evidence as being a fair reproduction of the appearance of the walk on April 7, 1964. From these pictures a jury could find that the entire width of the sidewalk was covered with compacted snow or ice for a distance of about 50 feet east of the Androy Hotel. It seems that the most-traveled or middle third of the sidewalk adjacent to the parking lot was covered with ice which was rough and irregular. The northerly and southerly thirds of this sidewalk were covered with what looks like ice and snow, piled or drifted to a limited extent.

These questions and answers appear:

"Q. And I will ask you to state whether or not during the twice a

week or thereabouts that you saw that sidewalk whether it was in substantially the same condition as it was on April 7th.

"A. I'd say it contained ice and snow on those occasions I observed it.

"Q. And how did those appearances compare with those shown in Plaintiff's Exhibits A and B?

"A. I would say that it was in similar condition to what is shown in these exhibits."

This testimony as given by Birkeland makes the case almost identical in this respect with Larson v. City of Mankato, 239 Minn. 484, 59 N. W. (2d) 312, where because of an unusual provision in the charter of the city of Mankato it was necessary to show that the dangerous condition of the street had existed for more than 10 days immediately prior to the accident. Assessing the evidence to see if it met the minimal requirement of the charter, the court said (239 Minn. 486, 59 N. W. [2d] 313):

"* * * Although [the witness] was reluctant to state that the exact condition had existed for more than a week, he stated that the condition of rough and uneven ice on the crosswalk had been a continuing one throughout the winter. Viewing this fact in conjunction with the surrounding circumstances disclosed by the record, we are of the opinion that the jury could reasonably infer that the dangerous condition had existed for a period of more than ten days before the accident in question."

Although Birkeland was cross-examined extensively and with effect, it is evident from reading his testimony as a whole that he was convinced and intended to convey the impression to the jury that the stretch of sidewalk here involved had not been free of rough ice and snow during the month preceding the occurrence of this accident. He acknowledged that the village of Hibbing followed the practice of removing ice and snow with the aid of sidewalk plows, but he observed that such snowplows "do not scrape necessarily to the concrete sidewalk and so * * * leave an accumulation when they are removing the snow." He commented also that there was no business structure abutting the sidewalk at the accident site, the implication being that a building wall

located to the south of the walk could serve both as a shield from wind-driven snow and a reflector for the rays of the sun. The possibility that the occupants of adjacent buildings in the business district might have aided in keeping the sidewalks clear may serve to explain the contrasting appearance of the sidewalk immediately to the east and immediately to the west of the portion abutting the parking area. The fact that these areas of the sidewalk were clear of ice and snow, as shown in the pictures, suggests that the task of removing the hazards involved was not an insuperable one.

No witness was called by the village of Hibbing to testify that the sidewalk adjacent to the parking lot had ever been wholly free of ice and snow at any given time before the occurrence of the accident. It is true that Hugh Danahy, assistant village engineer for the village of Hibbing for 30 years, testified with respect to daily notations that he had made concerning weather conditions and the practice of plowing the sidewalk on Howard Street after heavy snowfalls before doing so at other places, but there is no testimony that this particular part of Howard Street was in fact plowed or otherwise cleared on any given day or days.

The determination of the trial court that the testimony of Birkeland could not be relied upon was based principally upon an analysis of weather reports introduced by the parties. One was a record of weather observations made for the United States Department of Commerce Weather Bureau, apparently at the Hibbing airport, which was received in evidence as plaintiff's exhibit C. The other was a record of climatological observations made at or near Hibbing, covering the months of April and March, 1964 (defendant's exhibits 1 and 2).

These exhibits, although differing in some details, portray substantially the same weather picture and, had the case been submitted to the jury, could have supported these inferences:

(1) Between March 24 and April 1, 1964, the highest recorded temperature at Hibbing was 25 degrees above zero except for March 30, when the temperature was a high of 32 degrees above.

(2) Although minimal amounts of snow or snow and rain were noted on March 23, March 24, March 27, March 28, and March 29, the

snow and ice on the ground at Hibbing generally was noted to have been 6 inches for each of the days from March 25 until March 31.

(3) On each of the days of April preceding the occurrence of the accident, the temperature reached a high which was above freezing and a low which was below freezing, the high temperatures on the first 7 days of April, respectively, being 46, 47, 38, 47, 42, 38, and 33 degrees above zero.

(4) There was no precipitation recorded for the first 5 days of April and the snow and ice on the ground decreased in that period from 5 inches to 1 inch.

(5) Light snowfall was noted beginning at about 6 p. m. on April 5, which continued and was observed at hourly intervals on April 6 and during the first 8 hours of April 7. This snowfall was light or very light at the time of the hourly observations except during a period at about 7 a. m. on April 6, when the snowfall was heavy, a fact confirmed in a measure by the notation that normal visibility of 15 miles was reduced to one-half mile.

(6) Snow and ice on the ground had increased from 1 inch on April 5 to 5 inches as of 7 a. m. on April 6.

We do not find in these weather records unequivocal refutation of the testimony of Charles Birkeland to the effect that the rough and icy condition of the sidewalk had existed for a considerable time before April 7. Although the temperatures during the first week in April were above freezing each day, the temperature variance in each 24-hour period was as much as 33 degrees on April 4, when a high of 47 and a low of 14 was noted, and as little as 9 degrees on April 6, when a high of 38 and a low of 29 was recorded.

While it must be acknowledged that the trial court's analysis of the significance of the weather reports, as set out in his memorandum, casts doubt upon the accuracy of the observations of Mr. Birkeland, we do not feel that the weather data is sufficiently detailed or conclusive to permit the rejection of his testimony. We cannot say as a matter of law that the temperatures as disclosed by the weather reports were such as to cause compacted snow and ice at the place where the accident occurred to melt and run away so as to free the walk from such accumula-

tion before the commencement of the snowfall which apparently had its inception during the late hours of April 5. Apart from this, we cannot say as a matter of law that the failure of the city to remove snow and ice from the accident site either on April 6 or in the morning of April 7 was justified, and in the absence of any evidence on the question one way or the other we cannot assume that the village of Hibbing endeavored to remove snow from the sidewalk on either of these days.

It is our conclusion, therefore, that although the case is a close one, there was sufficient evidence to take the case to the jury under the issues as framed by the pleadings and litigated by the parties.

Reversed and new trial granted.